# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1298

_____

Bassel R. Banat,                    *
                                    *
            Petitioner,             *
                                    *     Petition for Review of an
    v.                              *     Order of the Board of
                                    *     Immigration Appeals.
Eric  H.  Holder,  Jr.,  Attorney   *
General  of  the  United  States  of   *          [PUBLISHED]
America,[1]                         *
                                    *
            Respondent.             *

_____

Submitted: November 13, 2008
Filed: March 6, 2009

_____

Before RILEY, HANSEN, and MELLOY, Circuit Judges.

_____

HANSEN, Circuit Judge.

_____

    [1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Eric H. Holder, Jr. is automatically substituted for former Attorney General Michael B. Mukasey as respondent in this case.

Bassel Banat petitions for review of the Board of Immigration Appeals' (BIA) order denying him asylum, arguing that his due process rights were violated when the Immigration Judge (IJ) based his adverse credibility determination on a State Department investigation report that Banat claims was inherently unreliable. We agree that the report was unreliable, and we grant the petition.

I.

Bassel Banat is a Palestinian refugee who was born and lived most of his life in Beirut, Lebanon. He finished college in Beirut and visited his brother, a United States citizen, in Minnesota in January 2001, where he attended college classes and applied for admission into graduate programs in the United States. He was not accepted to any graduate programs and originally planned to leave the United States on September 6, 2001, with his father, who was also visiting the United States. For unstated reasons, Banat decided to stay in the United States and did not return to Beirut until December 30, 2001, when his visitor visa expired.

Banat returned to the United States less than four weeks later on January 25, 2002, using a Lebanese passport. Banat applied for asylum with the Immigration and Naturalization Service (INS) on August 28, 2002. A hearing was held on October 4, 2005, and Banat testified on his own behalf. Banat testified that upon his return to Beirut on January 1, 2002, he was approached at the Beirut airport by two men with Syrian accents. He was told to go with the men to answer some questions, and he was blindfolded, handcuffed, and driven away in a car. Lebanese officials at the airport witnessed his abduction but did nothing to stop it. According to Banat's story, he was held for several days at a Palestinian refugee camp, questioned, and beaten. His captors spoke with Syrian accents, but he thought some were also Lebanese. The outside of the building indicated it belonged to the Popular Front for the Liberation of Palestine (PFLP). His captors accused him of working as a spy for the FBI or the CIA and wanted to know why he changed his travel plans just before the terrorist

attacks of 9/11 and stayed in the United States for several months following. They released him but did not take his passport and told him they might contact him for further questioning. They also tried to recruit him to fight with them against Israel.

Following his release, Banat stayed at his family's home for about two weeks. His father bought him a plane ticket and encouraged him to return to the United States. Banat arrived back in the United States on January 25, 2002. After arriving in the United States, Banat's father sent him a handwritten letter purporting to be from the PFLP that had been sent to Banat's Lebanon address prior to his return to the United States. The letter commanded Banat to return for questioning on January 26, 2002, and threatened that if Banat failed to report, "the arms of revolutionary justice will reach you and get back at you. Death to the traitors . . . " (Pet'r's Add. at 42.) Banat's parents allegedly received numerous threatening inquiries from the PFLP about his whereabouts. When his father died, Banat did not attend the funeral, and allegedly there were armed PFLP men at the funeral looking for Banat.

Banat introduced the handwritten PFLP letter at the October 4, 2005 hearing. The IJ noted that the letter "purport[ed] on its face to be a letter addressed to [Banat] from a recognized terrorist organization, the PFLP, which is one of the worst operators . . . among the Palestinian terrorist organizations" (Pet'r's App. at 73), and that it "ha[d] what purport[ed] to be an original seal of the PFLP" (id. at 75). The Department of Homeland Security (DHS) had not verified the authenticity of the letter, and the IJ inquired with the State Department about its authenticity. The State Department responded with a letter dated March 22, 2006, wherein it acknowledged that the U.S. Embassy in Beirut had not had any previous experience with that type of document, but that its investigation suggested that the letter had been fabricated. The IJ forwarded a copy of the State Department letter to the parties and held another hearing on May 26, 2006. Banat objected to introduction of the State Department letter into evidence, arguing that it was "internally inconsistent, . . . inherently unreliable, improper evidence, [a] violation of due process, [and afforded Banat] no

opportunity to cross-examine." (Id. at 91.) Although Banat's counsel stated he could get affidavits from others contesting statements in the State Department letter, he did not offer them at the hearing. The IJ issued an oral decision finding that Banat was not credible based primarily on the IJ's conclusion that the PFLP letter had been fabricated. The IJ denied Banat's request for asylum, withholding of removal, and relief under the Convention Against Torture.

Banat appealed the IJ's decision to the BIA. The BIA dismissed the appeal, concluding that introduction of the State Department letter did not violate Banat's due process rights, and it affirmed the IJ's adverse credibility determination. Banat now seeks review of the BIA's order dismissing his appeal.

II.

In an appeal from the BIA, we review the BIA's fact-findings for substantial evidence, and we review its legal determinations, as well as any constitutional challenges, *de novo*. Ntangsi v. Gonzales, 475 F.3d 1007, 1011-12 (8th Cir. 2007). Where the BIA adopts the IJ's reasoning, we review the IJ's decision as well. See Bhosale v. Mukasey, 549 F.3d 732, 735 (8th Cir. 2008). The IJ determined that if Banat's story had been credible, he would have found that Banat suffered past persecution and would have been entitled to relief. (Pet'r's Add. at 29.) The IJ ultimately discredited Banat's testimony, however, relying on the State Department letter's determination that the handwritten PFLP letter had been fabricated, coupled with the lack of any other corroboration for Banat's story. Adverse credibility determinations, like other findings of fact, must be supported by substantial evidence. See Mamana v. Gonzales, 436 F.3d 966, 968 (8th Cir. 2006). "An IJ making a[n adverse] credibility determination must give reasons that are specific enough that a reviewing court can appreciate the reasoning behind the decision and cogent enough that a reasonable adjudicator would not be compelled to reach the contrary conclusion." Guled v. Mukasey, 515 F.3d 872, 881 (8th Cir. 2008) (internal marks

omitted).  The BIA affirmed the IJ's credibility finding based on its conclusion that introduction of the State Department letter did not violate Banat's right to due process.

Banat argues that his due process rights were violated when the IJ relied on the State Department letter to make his adverse credibility determination.  Although the Federal Rules of Evidence are not controlling in an immigration proceeding, the Fifth Amendment right to due process places limits on the evidence that may be considered in an immigration hearing.  Tamenut v. Ashcroft, 361 F.3d 1060, 1061 (8th Cir. 2004).  Due process requires that the IJ consider only evidence that is "probative and its admission fundamentally fair." Tun v. Gonzales, 485 F.3d 1014, 1025-26 (8th Cir. 2007) (internal marks omitted).  The focus in a due process inquiry is on fairness.  "'In the evidentiary context, fairness is closely related to the reliability and trustworthiness of the evidence.'" Ezeagwuna v. Ashcroft, 325 F.3d 396, 405 (3d Cir. 2003) (quoting Felzcerek v. INS, 75 F.3d 112, 115 (2d Cir. 1996)).  Thus, Banat must show that the State Department letter was unreliable and untrustworthy and therefore improperly considered in violation of his right to due process.

Banat's due process claim turns on the reliability of the investigation conducted by the State Department in response to the IJ's inquiry about the authenticity of the handwritten PFLP letter.  We recognize that overseas investigations by State Department officials concerning the authenticity of documents purportedly originating in foreign countries are often necessary for the adjudication of an asylum claim.  See, e.g., Rafiyev v. Mukasey, 536 F.3d 853, 856-57 (8th Cir. 2008) (affirming IJ's determination that documents were fraudulent based on examination by foreign document examiner and investigation by the U.S. Embassy in Azerbaijan). Nonetheless, when a report of an investigation concerning the authenticity of a document is presented in an asylum hearing, sufficient evidence must be presented to allow the IJ to determine the investigation's reliability and trustworthiness without surrendering that function to the author of the report.  See Alexandrov v. Gonzales, 442 F.3d 395, 405 (6th Cir. 2006) (reiterating that IJs and the BIA "should exercise

extreme caution in relying on" State Department reports to deny asylum claims because "excessive deference to the government or a shallow evaluation of the evidence by the immigration court would be unwarranted" (internal marks omitted)); cf. Averianova v. Mukasey, 509 F.3d 890, 896 (8th Cir. 2007) (affirming IJ's conclusion that an INS investigation was trustworthy based on photographic evidence introduced by the INS that corroborated the investigation's results).

Reliance on reports of investigations that do not provide sufficient information about how the investigation was conducted are fundamentally unfair because, without that information, it is nearly impossible for the immigration court to assess the report's probative value and the asylum applicant is not allowed a meaningful opportunity to rebut the investigation's allegations. See Anim v. Mukasey, 535 F.3d 243, 257 (4th Cir. 2008). "The Department of Justice itself has recognized the need for a detailed [investigation] report." Lin v. U.S. Dep't of Justice, 459 F.3d 255, 270 (2d Cir. 2006). According to the Department of Justice, "'[a] report that is simply a short statement that an investigator has determined an application to be fraudulent is of little benefit. Instead, the report should lay a proper foundation for its conclusion by reciting those factual steps taken by the investigator that caused the investigator to reach his or her conclusion.'" Id. (quoting Memorandum from Bo Cooper, INS General Counsel, to Jeffrey Weiss, INS Director of International Affairs, Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information, at 6 (June 21, 2001)). For purposes of assessing the reliability of an investigation report, the Second Circuit distilled the Department of Justice's list of items that should be included in such a report down to three useful factors, including: "(i) the identity and qualifications of the investigator(s); (ii) the objective and extent of the investigation; and (iii) the methods used to verify the information discovered." Id. at 271; see also Anim, 535 F.3d at 257-58 (discussing the same Department of Justice requirements for an investigation report); Ezeagwuna, 325 F.3d at 407-08 (expressing concern over the INS's attempt to use the prestige of the State Department letterhead to give credibility to an investigation report's contents); Balde v. Mukasey, 278 Fed.

Appx. 707, 709 (8th Cir. 2008) (unpublished) (citing <u>Lin</u> as describing the factors courts use to assess the reliability of investigation reports).

The State Department letter in this case states that "an investigator" from the U.S. Embassy in Beirut met with "a contact" who worked closely with the Palestine Liberation Organization (PLO) and the PFLP; that the contact was shown a copy of the handwritten PFLP letter; and that the contact said it was fabricated based on three facts: the person identified as the author of the PFLP letter was unknown and would not sign such documents, the PLO and PFLP do not issue those types of documents, and the PFLP seal is widely available, making it easy to fabricate a letter from the PFLP. (Pet'r's Add. at 45.) From that, the State Department concluded that the PFLP letter had been fabricated. In the State Department report of the results of the investigation to the IJ, the investigator is not identified. All the report conveys is that the unidentified investigator showed the PFLP letter to an unidentified contact. There is no indication of the qualifications or experience of either the investigator or the contact. The extent of the investigation included merely showing the letter to the unidentified contact. And there is no indication that any attempt was made to verify the claims made by the unidentified contact. None of the <u>Lin</u> factors are met. Investigation reports that contained even more information about their respective investigations have been found to be too cursory to satisfy due process concerns. <u>See Anim</u>, 535 F.3d at 258 ("In short, the letter's lack of information about the [unnamed] investigator, how the investigation was conducted, and how and why the named official reached his forgery conclusion make it practically impossible to assess the letter's reliability."); <u>Alexandrov</u>, 442 F.3d at 407 (holding that reliance on a State Department memorandum declaring documents to be fraudulent violated the petitioner's right to due process where the memorandum did "not clarify to any degree what type of investigation was conducted or who the investigator was"); <u>Lin</u>, 459 F.3d at 271-72 (finding an investigation report unreliable where, although it named the investigators, it provided no information about their qualifications, did not detail when and where conversations occurred upon which the report's conclusions relied, and it

did not detail what actions were taken to verify the information provided in the report); Ezeagwuna, 325 F.3d at 408 (concluding "that the complete dearth of information about the investigator or the investigation undermines the [investigation] letter as . . . untrustworthy").

Not only does the State Department letter fail to provide any details about the investigation, it also includes multiple levels of hearsay. The letter was written by Nadia Tongour, Office Director for the Office of Country Reports and Asylum Affairs. In the letter, Ms. Tongour relayed information received from an unnamed investigator from the U.S. Embassy in Beirut who discussed the PFLP letter with an unnamed contact. There are at least three levels of hearsay–the contact to the Embassy investigator, the investigator to Ms. Tongour, and Ms. Tongour's written report–and likely more levels as it is not clear from the State Department letter that Ms. Tongour received the information she reported directly from the investigator. Although hearsay in and of itself is not prohibited in immigration proceedings, see 8 C.F.R. § 1240.7(a), "[h]ighly unreliable hearsay might raise due process problems." Alexandrov, 442 F.3d at 405. "Multiple hearsay, where the declarant is steps removed from the original speaker, is particularly problematic because the declarant in all likelihood has been unable to evaluate the trustworthiness of the original speaker." Anim, 535 F.3d at 257. These concerns played out in this case. During the hearing, Banat questioned the reliability of the contact based on his alleged close ties to both the PFLP and the PLO, two groups who, according to Banat, are at odds with each other. Without more information about the contact or what the Embassy investigator did to corroborate the contact's reasons for concluding that the PFLP letter was fabricated, Banat is not able to effectively challenge the contact's credibility, and the IJ has no information on which to base a credibility assessment of the contact, the original speaker who concluded that the PFLP letter had been fabricated.

We understand that hearsay in the form of a report of an investigation conducted by State Department officials is often the only practical method for

addressing the authenticity of foreign documents, and such hearsay evidence is allowed in immigration hearings where it is otherwise shown to be trustworthy. We fully recognize that divulging more information concerning the particulars of the investigations undertaken may, in some cases, run the very real risk of compromising and jeopardizing the physical safety of the clandestine sources, confidential contacts, and investigators (whether undercover or not) used by the State Department and the other agencies of the Executive Branch in foreign countries, particularly in the dangerous and shadowy world of dealing with violent terrorist organizations; and we readily admit that a proper balancing of the risks involved in such undertakings and in what to report openly about them is not within the ken (or the constitutional responsibility) of federal courts so far removed from the scene. However, as in this case, it does become the business of immigration judges and reviewing authorities like us to assess the reliability of the reports that are produced, and the report in this case was glaringly deficient in providing the most basic indicia of its circumstantial probability of reliability. There is no information provided about whether or not the Embassy had used either the "investigator" or the "contact" as a source of information in the past; whether the "investigator" was experienced or had any particular training in conducting such investigations; whether or not the "investigator" or the "contact" had provided any information that had proved to be correct and reliable in the past; and there is no representation that the Embassy itself considered the "contact" to be either reliable or well informed, or even knowledgeable about the reported matters. We conclude that the IJ's reliance on the State Department letter, which provided no details about the investigation that would allow the IJ to assess the investigation's reliability or trustworthiness and which contained multiple levels of hearsay, violated Banat's right to a fundamentally fair hearing.

To be entitled to relief based on a due process violation, Banat must also show prejudice, or that the procedural error "had the potential for affecting the outcome." Tun, 485 F.3d at 1026 (internal marks omitted). "[W]here a hearsay document is admitted but not primarily relied upon and the petitioner receives the opportunity to

rebut the document's conclusions through his witnesses, the fundamental fairness of the proceedings has not been impinged." Alexandrov, 442 F.3d at 406-07 (internal marks omitted).  The State Department letter clearly had an effect on the outcome of Banat's asylum hearing.  The IJ's conclusion that Banat was not entitled to asylum "turn[ed] entirely on issues of credibility." (Pet'r's Add. at 29.)  The PFLP letter was the only contemporaneous corroboration for Banat's story, and the IJ relied heavily on the State Department letter to find that the PFLP letter had been fabricated.  The IJ then relied primarily on the fabricated PFLP letter to support his conclusion that Banat's story was not credible.  The IJ stated that if he would have found Banat credible, he would have been entitled to relief.  (Id.)  We agree with Banat that if the IJ did not consider the unreliable State Department letter, the proceeding may well have had a different outcome.  See Anim, 535 F.3d at 258-59 (finding prejudice from an IJ's reliance on an unreliable investigation report where the IJ stated that the fraud investigation would determine whether he believed the petitioner's story or not); Alexandrov, 442 F.3d at 407 (finding prejudice where the unreliable investigation report was the sole piece of evidence relied upon by the IJ for its adverse findings).

## III.

Banat was prejudiced when the IJ relied on the State Department letter to find Banat not credible in violation of Banat's right to due process during his asylum hearing.  We therefore grant the petition for review, vacate the BIA's decision, and remand for further proceedings not inconsistent with this opinion.  See Tun, 485 F.3d at 1031.

_____

-10-