# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1249

_____

Eduardo Escobar

*Petitioner*

v.

Merrick B. Garland, Attorney General of the United States and the Executive
Office of Immigration Review

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: October 18, 2022
Filed: December 15, 2022

_____

Before SMITH, Chief Judge, BENTON and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Eduardo Escobar is a 31-year-old man alleged to be a native and citizen of
Honduras present in the United States without being lawfully admitted. Escobar
petitions for review of an order of the Board of Immigration Appeals (BIA)
upholding the decision of an immigration judge (IJ) that found Escobar removable

and denied his application for deferral of removal under the Convention Against Torture (CAT). Having jurisdiction under 8 U.S.C. § 1252, we deny the petition.

I.

Escobar entered the United States as a child but claims to know little about the circumstances of his birth or his entry into the country. Escobar has also struggled with mental illness, having been diagnosed with schizophrenia, and he has a significant criminal record.

While Escobar has offered little information about his past, the record indicates that he was brought to the United States as a young child by his mother, Maria Elsomina Escobar, a Honduran citizen. Soon after her entry into the United States in the early 1990s, Maria Escobar stole the identity of an American citizen named Maria Mateo. In 2013, Maria Escobar accepted a plea agreement on charges of possessing and falsifying immigration documents. In sworn statements included in her plea agreement, Maria Escobar stated that all but one of her children, including Eduardo Escobar, were born in Honduras. She also admitted that she was born in Honduras and has been residing illegally in the United States since she entered the country.

Between 2010 and 2021, Eduardo Escobar sustained multiple convictions: a first-degree assault charge, two burglary charges, a drug possession charge, a felon-in-possession charge, and a second-degree robbery charge. In May 2021, after years of investigation, the Department of Homeland Security (DHS) initiated removal proceedings against Escobar while he was serving a term of involuntary commitment at a Missouri mental health facility.

In the Notice to Appear (NTA), DHS alleged that Escobar is a native and citizen of Honduras who entered the United States unlawfully at an unknown location and date. The NTA also detailed Escobar's criminal history dating back to 2010: six charges resulting in an aggregate sentence of 16 years incarceration. The

NTA charged Escobar with removability under the Immigration and Nationality Act as an alien present in the United States without being admitted or paroled, 8 U.S.C. § 1182(a)(6)(A)(i); as an alien convicted of a controlled substance-related offense, id. § 1182(a)(2)(A)(i)(II); and as an alien convicted of two or more offenses for which the aggregate sentence is five or more years of incarceration, id. § 1182(a)(2)(B). In June 2021, DHS added further grounds for removability as an alien who has been convicted of a crime involving moral turpitude. Id. § 1182(a)(2)(A)(i)(I). Escobar appeared before an IJ and, through counsel, filed a motion to terminate the proceedings, arguing that DHS had not met its burden of proof to establish alienage by clear and convincing evidence.

After finding Escobar competent to participate in the proceedings, the IJ considered evidence and heard testimony from Escobar and DHS on the issue of removability. Escobar objected to some of the evidence offered by DHS, including his mother's sworn statement in her 2013 plea agreement. The IJ overruled these objections, finding that all the contested evidence met the threshold for admissibility in removal proceedings. Moreover, the IJ noted that any inconsistencies in the evidence spoke to the weight to be given to that evidence, not its admissibility.

After reviewing the evidence, the IJ found that DHS had satisfied its burden to prove Escobar's removability by clear and convincing evidence. The IJ's analysis focused primarily on Escobar's argument that DHS failed to establish alienage. The IJ found that, unlike a typical removal case, the Form I-213 submitted by DHS was "not, by itself, sufficient proof of [Escobar's] alienage." Thus, the IJ turned to other evidence submitted by DHS, including Escobar's mother's plea agreement, evidence of Escobar's relationship with his mother, and several Honduran birth documents allegedly identifying Escobar and his family members. The IJ found that, though these documents "individually[] may not be sufficient to meet [DHS's] burden," together they provided clear and convincing evidence of Escobar's alienage. The IJ noted that, in making this determination, he used "common sense inferences" to piece together documents that were not always "perfectly congruent." Thus, the IJ concluded that DHS had satisfied its burden of proof and that Escobar had come

forward with no evidence demonstrating that he was lawfully present in the United States. Accordingly, the IJ denied Escobar's motion to terminate and found Escobar to be removable to Honduras.

Escobar also sought deferral of removal under CAT, arguing that he would be subject to torture upon his arrival in Honduras. Specifically, Escobar pointed to his schizophrenia and the inhumane conditions to which he would be subject within Honduran prisons and mental health hospitals. However, the IJ rejected Escobar's CAT argument, finding that though "conditions in Honduran psychiatric hospitals and prisons are far below the standard of care found in the United States, they do not satisfy the threshold for torture under CAT." In particular, the IJ found that Escobar's torture argument was speculative because it relied on a "series of events that he contends will lead to his torture." Further, the IJ found that Escobar could not show that the Honduran government will specifically intend to torture him or acquiesce in that torture. Thus, the IJ denied CAT relief.

Escobar appealed to the BIA. Before the BIA, he challenged the IJ's decision to admit certain documents into the record, the IJ's finding that DHS had proven alienage by clear and convincing evidence, and the IJ's denial of deferral of removal under CAT. In a brief three-page opinion, the BIA largely adopted the IJ's reasoning and findings but supplemented the IJ's decision with its own analysis. In particular, the BIA rejected Escobar's argument that the IJ improperly relied on inferences to find that DHS had carried its burden to prove alienage. The BIA agreed with the IJ that the evidence was "not perfectly congruent" but found that Escobar could not show that the IJ's alienage finding was clearly erroneous, as required for reversal. See 8 C.F.R. § 1003.1(d)(3)(i). The BIA also affirmed the IJ's conclusion that Escobar had not demonstrated entitlement to CAT relief because he had not shown that he would be tortured within the meaning of the regulations. Accordingly, the BIA affirmed the IJ on all claims and dismissed Escobar's appeal. Escobar now petitions this Court for review.

II.

Before us, Escobar asserts that the BIA erred both with respect to the alienage determination and the denial of CAT relief. In removal cases, we review "questions of law *de novo*" and "factual determinations under the substantial evidence standard, reversing only if 'the evidence is so compelling that no reasonable factfinder could fail to find in favor of the petitioner.'" Gilbertson v. Garland, 7 F.4th 700, 704 (8th Cir. 2021) (citation omitted). Put differently, we must affirm the BIA's factual findings "unless any reasonable adjudicator would be compelled to conclude to the contrary." Etchu-Njang v. Gonzales, 403 F.3d 577, 580 (8th Cir. 2005) (quoting 8 U.S.C. § 1252(b)(4)(B)). "Though we ordinarily review only the BIA's decision, 'we also review the IJ's decision as part of the final agency action' if 'the BIA adopted the findings or the reasoning of the IJ.'" Etenyi v. Lynch, 799 F.3d 1003, 1006 (8th Cir. 2015) (citation omitted). Because the BIA adopted the findings and reasoning of the IJ here, we consider both decisions on this petition for review.

A.

Escobar first argues that the IJ and BIA erred in finding that DHS sufficiently proved Escobar's alienage. In removal proceedings, DHS "bears the burden of establishing removability by clear and convincing evidence." Garcia-Torres v. Holder, 660 F.3d 333, 335 (8th Cir. 2011). In the case of a noncitizen allegedly present in the United States without being lawfully admitted, DHS "must first establish the alienage" of that individual by "clear and convincing evidence." 8 C.F.R. § 1240.8(a), (c). If DHS establishes alienage by clear and convincing evidence, "then the burden shifts to the alien to prove he is lawfully present in the United States pursuant to a prior admission." Puc-Ruiz v. Holder, 629 F.3d 771, 781 (8th Cir. 2010) (citation omitted).

As a preliminary matter, Escobar contends that the IJ violated his due process rights by admitting unreliable evidence. For example, the birth certificates provided by DHS included inconsistencies in name and date of birth, and Escobar insists that

the form of the birth certificates indicates possible fraud. Further, Escobar argues that the sworn statements by Maria Escobar are inherently unreliable because she later admitted to using a false identity.

We disagree. It is well established that "traditional rules of evidence do not apply in immigration proceedings, except to the extent that due process is implicated." Lybesha v. Holder, 569 F.3d 877, 882 (8th Cir. 2009). To satisfy due process in a removal proceeding, "evidence must be probative and its admission must be fundamentally fair." Id.; see also Patel v. Sessions, 868 F.3d 719, 723 (8th Cir. 2017) (describing this standard as the "sole test for admission of evidence" in removal proceedings). Here, the evidence submitted by DHS meets this standard. While some of the evidence includes undeniable inconsistencies, it is all probative of Escobar's alienage. And there is no indication that its admission was fundamentally unfair. For example, Escobar was not "prevented from submitting evidence to refute" DHS's evidence, Lybesha, 569 F.3d at 882; there was no exclusion of "clearly admissible and highly probative testimony," Tun v. Gonzales, 485 F.3d 1014, 1026 (8th Cir. 2007); and there was no admission of "[h]ighly unreliable hearsay" testimony, Banat v. Holder, 557 F.3d 886, 892 (8th Cir. 2009) (alteration in original) (citation omitted). In the absence of fundamental unfairness in the admission of evidence, Escobar's due process argument must fail. Any inconsistencies speak to the weight of the evidence, not its admissibility. Cf. United States v. Rodriguez, 484 F.3d 1006, 1014 (8th Cir. 2007).

Escobar's primary argument is that the IJ improperly relied on inferences in finding that DHS proved alienage by clear and convincing evidence. The BIA has held—and we have confirmed—that IJs may make "reasonable inferences from direct and circumstantial evidence of the record as a whole." See Matter of D-R-, 25 I. & N. Dec. 445, 454 (BIA 2011); Etenyi v. Lynch, 799 F.3d 1003, 1007 (8th Cir. 2015) (citing Matter of D-R-, 25 I. & N. Dec. at 454). "An inference is not impermissible as long as it is supported by 'record facts, or even a single fact, viewed in the light of common sense and ordinary experience.'" Matter of D-R-, 25 I. & N. Dec. at 454 (citation omitted).

Escobar contends that IJs may properly rely on inferences only when considering witness credibility, not when determining whether DHS met its burden to prove alienage. For support, Escobar cites Matter of Guevara, 20 I. & N. Dec. 238 (BIA 1990), in which the BIA held that the government had not established the respondent's removability by clear and convincing evidence when the government relied on nothing more than the respondent's silence in the face of questioning. Id. at 244-45. Escobar argues that Matter of Guevara requires DHS to "establish a prima facie case of alienage" separate from any inferences drawn. Id. at 242. However, Escobar overreads the case. Matter of Guevara merely stands for the proposition that "*the respondent's silence alone* does not provide sufficient evidence, in the absence of any other evidence of record at all, to establish a prima facie case of alienage." Id. (emphasis added). It does not flatly bar the use of inferences in assessing the evidence put forward by DHS to prove alienage. Indeed, the Ninth Circuit has held that while silence alone is "insufficient to meet the government's burden of proving alienage," inferences may be used when assessing alienage, even allowing an "adverse inference" to be drawn from a petitioner's refusal to deny alienage. Torres-Chavez v. Holder, 567 F.3d 1096, 1102 (9th Cir. 2009) (citing Matter of Guevara, 20 I. & N. Dec. at 241). We read our precedent, out-of-circuit precedent, and BIA precedent to allow an IJ to use common-sense inferences when reviewing evidence to determine whether DHS met its burden of proving alienage.

Having established that the IJ did not err as a matter of law in using common-sense inferences when reviewing the record, we hold that substantial evidence supports the IJ's conclusion—affirmed and adopted by the BIA—that DHS satisfied its burden to prove Escobar's alienage by clear and convincing evidence. "The substantial evidence standard that we employ when reviewing BIA factual determinations is extremely deferential." Eusebio v. Ashcroft, 361 F.3d 1088, 1091 (8th Cir. 2004). Reversal is appropriate only if, based on the factual record before us, "any reasonable adjudicator would be *compelled* to conclude" that DHS had not established by clear and convincing evidence that Escobar is a Honduran national. Etchu-Njang, 403 F.3d at 580 (emphasis added) (quoting 8 U.S.C. § 1252(b)(4)(B)).

The IJ and BIA concluded that DHS met its burden, and the record before us does not compel a contrary result.

Several parts of the record inform this conclusion. First and foremost, Maria Escobar's sworn statement to officers, recounted in her 2013 plea agreement, identified her five children by name, including Eduardo Escobar. Maria "stated that all of her children, with the exception of [her youngest daughter], were born in Honduras." Further, Maria "stated that Eduardo Escobar was six months old when she left Honduras and entered the United States, without inspection by an Immigration Officer, sometime around 1992." While Maria later admitted to identity theft, the IJ viewed Maria's statements together with other evidence in the record to infer that the statements were sufficiently reliable. For example, Escobar has stated in interviews that he believes Maria to be his mother, even once using her stolen surname: Mateo. Moreover, some of Escobar's past criminal records list Maria's address as his own. Maria's statements are also consistent with Escobar's documented date of birth in 1991. Viewed in light of the whole record, the IJ reasonably inferred that Maria's statements about Escobar's birth and nationality were truthful.

Additional evidence corroborates Maria's sworn statement regarding Escobar's Honduran birth, though there are some inconsistencies. For example, DHS provided several birth documents, including a Honduran birth certificate for "Edward Argenis Martinez Escobar," dated October 8, 1990. However, Escobar's name is misspelled, the date of birth is over a year removed from Escobar's documented date of birth, and Escobar disputes the authenticity of the document. In response, DHS provided a sworn affidavit corroborating the birth certificate as well as additional certification from the Honduran government. And the date of birth, while inconsistent with the rest of the record, is roughly consistent with Escobar's current age. We recognize, as the IJ noted, that the evidence is "not perfectly congruent." But our review at this stage is "extremely deferential." Eusebio, 361 F.3d at 1091. We will reverse the factual findings of the BIA only if "it would not be possible for a reasonable fact-finder to adopt the BIA's position." Id. Because

-8-

the inconsistencies here are not so significant as to compel a different result, we must affirm.

## B.

Next, Escobar challenges the IJ's denial of CAT relief—affirmed and adopted by the BIA—arguing that he properly demonstrated that he would more likely than not be subjected to torture in Honduras because of his mental illness. As with findings of alienage, "[w]e review the BIA's [factual] determinations regarding . . . CAT relief under the substantial evidence standard" and its "legal determinations de novo." Constanza v. Holder, 647 F.3d 749, 753 (8th Cir. 2011).

To be eligible for deferral of removal under CAT, the petitioner must "establish that it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." Jama v. Wilkinson, 990 F.3d 1109, 1118 (8th Cir. 2021) (alteration in original) (quoting 8 C.F.R. § 1208.16(c)(2)), cert. denied 142 S. Ct. 773 (2022).[1] "In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." 8 C.F.R. § 1208.18(a)(5). Because of the specific intent requirement, the "petitioner may not obtain relief under the CAT unless he can show that his prospective torturer has the goal or intent of inflicting severe physical or mental pain or suffering upon him," not

---

[1]CAT contemplates two forms of relief for noncitizens: deferral of removal and withholding of removal. See Jama, 990 F.3d at 1117 n.6; 8 C.F.R. § 1208.16(c)(4). If the applicant meets his burden under CAT, withholding of removal is the mandated form of relief unless the applicant is subject to mandatory denial of withholding of removal. 8 C.F.R. § 1208.16(c)(4). Mandatory denial of withholding applies if, for example, the applicant "has been convicted of a particularly serious crime." Id. § 1208.16(d)(2). An applicant otherwise barred from withholding of removal is still entitled to deferral of removal if he meets the initial burden of proof. Id. §§ 1208.16(c)(4), 1208.17(a). Here, Escobar seeks only deferral of removal, not withholding of removal. Either way, the legal question remains the same: whether Escobar has demonstrated that he would "more likely than not . . . be tortured in the country of removal." Id. § 1208.16(c)(4).

merely that "pain or suffering is practically certain to occur." Cherichel v. Holder, 591 F.3d 1002, 1013-14 (8th Cir. 2010), abrogated on other grounds by Nasrallah v. Barr, 140 S. Ct. 1683 (2020). In addition, the petitioner must show that "such torture would be at the hands of or acquiescence of" the government. Jama, 990 F.3d at 1118 (citing 8 C.F.R. § 1208.18(a)(1)). "A government does not acquiesce in the torture of its citizens merely because it is aware of torture but powerless to stop it, but it does cross the line into acquiescence when it shows willful blindness toward the torture of citizens by third parties." Id. at 1119 (citation omitted).

Escobar's CAT claim fails because he cannot show that the Honduran government specifically intends to inflict torture or would otherwise acquiesce in torture committed by third parties. Before the IJ and the BIA, Escobar insisted that, upon his removal to Honduras, he would be screamed at, publicly mocked, stoned, and even raped or beaten at the hands of prison and hospital staff because of his severe mental illness. Indeed, Escobar has presented much evidence indicating that Honduran psychiatric hospitals and prisons are overcrowded, unsanitary, and altogether substantially below the standards of the United States. Even assuming that Escobar would be subject to harsh conditions upon his removal to Honduras, Escobar cannot obtain CAT relief because those conditions are due to a "lack of resources" rather than a "specific intent to cause severe pain or suffering." Gonzales v. Garland, 29 F.4th 989, 997 (8th Cir. 2022) (citation omitted). "It is not enough to allege that prison conditions constitute torture when they are the result of neglect and underfunding rather than intentional and targeted." Id. Based on Escobar's own evidence, the Honduran mental health system "does not adequately address its population's need and demand for services" due to "insufficient funding," an "unequal distribution of resources," and a "lack of adequate strategies for decentralizing health services." Under our precedent, such evidence is inadequate to demonstrate a specific intent to inflict torture. See id.

Nor has Escobar demonstrated government acquiescence in torture by third parties. The IJ found that the Honduran government was not "willfully blind to abuse" because it has "taken actual steps" to improve the harsh conditions in its

mental health facilities and remove abusive police officers.  Such a finding that "the government itself has participated in the development of mental health care systems" cuts against a finding of government acquiescence in torture.  Jama, 990 F.3d at 1119.  And nothing in the record before us compels a different result.

In sum, we find that substantial evidence supports the IJ and BIA's conclusion that Escobar failed to show that he would more likely than not be subject to torture in Honduras.  Thus, we must affirm the BIA's denial of Escobar's CAT claim.

III.

For the foregoing reasons, we deny the petition for review.

_____
